**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DOROTHY F. GARDNER, *et al.*,** | * | |
| **Plaintiffs** | * | |
| **v.** | * | **CIVIL NO. JKB-15-2874** |
| **UNITED STATES OF AMERICA, *et al.*,** | * | |
| **Defendants** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM

Dorothy F. Gardner, Christopher Gardner, and Brendan Gardner (collectively, "Plaintiffs")

brought a wrongful-death action against the United States of America and certain medical and

correctional personnel employed at the Federal Correctional Institution, Cumberland ("FCI

Cumberland"), a Federal Bureau of Prisons ("BOP") facility located in Maryland.   Plaintiffs'

claims arise from the 2013 death of Stephen P. Gardner ("the Decedent"), deceased spouse of

Dorothy and father of Christopher and Brendan.   Plaintiffs named as Defendants Dr. Mohamed

Moubarek ("Dr. Moubarek"); Dr. Michael Lin ("Dr. Lin"); Physician Assistant Tom Gera ("PA

Gera");[1] Lisa Eckard, RN ("Nurse Eckard"); and Senior Officer Specialist Gregory Scott Bennett

("Officer Bennett") (collectively, "the Individual Defendants"), as well as Correctional Officer

John Does 1–10 ("the John Doe Defendants").   Against the Individual and John Doe Defendants,

Plaintiffs pleaded deliberate indifference to the Decedent's medical needs in violation of the Eighth

Amendment, a theory made actionable under *Bivens v. Six Unknown Named Agents of Federal*

---

[1] The parties have stipulated to the dismissal of PA Gera on immunity grounds, as he is a Commissioned Officer
with the United States Public Health Service.  (*See* ECF Nos. 19–1 at 17 & 43 at 4.)  Accordingly, the Court will
omit from its analysis in this Memorandum any discussion of Plaintiffs' former claim against PA Gera, who shall be
terminated from these proceedings.

*Bureau of Narcotics*, 403 U.S. 388 (1971).[2]  Against the United States, Plaintiffs pleaded a claim

under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*

Now pending before the Court is the Individual Defendants' Motion to Dismiss or, in the

Alternative, for Summary Judgment.  (ECF No. 19.)  The issues have been briefed (ECF Nos.

19–1, 43 & 48), and no hearing is required, *see* Local Rule 105.6 (D. Md. 2014).  For the reasons

explained below, the Court will convert the Individual Defendants' motion via Rule 12(d) of the

Federal Rules of Civil Procedure; analyze the case pursuant to the summary-judgment

framework of Rule 56; and GRANT the motion, entering judgment for the Individual Defendants

on Plaintiffs' Eighth Amendment count.[3]

## I.    *Factual Overview and Procedural History*[4]

On December 11, 2008, the Decedent was sentenced in the United States District Court

for the Southern District of California to a ninety-seven month term of incarceration after

pleading guilty to charges of securities fraud, conspiracy, and obstruction of justice.  (ECF No.

19–3 at 1-2.)  Because of the Decedent's significant medical history, which included a diagnosis

of coronary artery disease and two prior heart attacks, the BOP initially designated him to the

Federal Medical Center, Devens ("FMC Devens"), a facility located in Massachusetts.  (ECF No.

1 ¶¶ 23-24, 26.)  In advance of the Decedent's arrival at FMC Devens, his primary-care

physician submitted a letter to the prison medical staff detailing the Decedent's medical history,

his required treatment, and his prescription regimen.  (*Id.* ¶¶ 25-30.)

---

[2] *See Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) ("A *Bivens* action is a judicially created damages remedy designed to vindicate violations of constitutional rights by federal actors.").

[3] In the event that Plaintiffs identify additional facts through discovery giving rise to an Eighth Amendment claim against one or more as-yet unnamed prison officials (the John Doe Defendants), the Court will entertain a motion for leave to amend pursuant to Rule 15(a)(2).  Plaintiffs are forewarned, however, that the Court is unlikely to grant such leave if the proposed claims are materially similar to those that the Court rejects in this Memorandum.

[4] Because the Court will convert the Individual Defendants' motion to one for summary judgment, this Part includes citations to the record.  However, the facts and *reasonable*, nonspeculative inferences to be drawn therefrom are taken in the light most favorable to Plaintiffs.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

Upon arriving at FMC Devens in April 2009, the Decedent underwent a medical examination; he informed the examining physician that he had last taken nitroglycerin for chest pain in 2007.  (ECF No. 20 at 1.)  In November of that year, the Decedent requested a medical discharge and reassignment to the Federal Prison Camp, Devens ("FPC Devens") (ECF No. 21 at 1); in connection with this transfer request, the Decedent met with a cardiologist, who reported that from a "cardiac standpoint" the Decedent "appear[ed] to be doing well" and that he had "denied chest pain, dyspnea, orthopnea, PND, palpitations, dizziness or syncope."  (ECF No. 22 at 1-2.)  Following additional examinations and tests, the Decedent was reassigned to FPC Devens (ECF No. 19–10 at 1); thereafter, in April 2013, he was transferred to FCI Cumberland (ECF No. 19–12 at 1).[5]  The transfer paperwork noted that the Decedent had been assigned a "regular duty work status with no medical restrictions."  (ECF No. 19–11 at 1.)

On May 1, 2013, Defendant Nurse Eckard, an FCI Cumberland employee, performed an initial health screen of the Decedent:  she noted potential items for follow-up (including the Decedent's cardiac history), and she renewed his medications.  (ECF No. 26 at 4-5.)  On May 8, 2013, the Decedent had an appointment with Defendant Dr. Lin, who noted that the Decedent reported "good exercise tolerance" and no chest pain since 2007.  (ECF No. 27 at 1.)  Dr. Lin continued Nurse Eckard's prescription orders; he also scheduled the Decedent for several tests, including bloodwork and an electrocardiogram ("EKG"),[6] and he set in a follow-up appointment for October 2013.  (*Id.* at 4-5.)[7]  Dr. Lin advised the Decedent to return to health services if his condition worsened, and he discharged the Decedent to an unrestricted housing unit.  (*Id.* at 21.)[8]

---

[5] The Decedent was transferred to FCI Cumberland so that he could participate in a residential drug abuse program that was no longer available at FPC Devens.  (ECF No. 19–11 at 1.)
[6] The Decedent's EKG results were normal.  (ECF No. 28 at 1.)
[7] Dr. Lin's report was cosigned by Defendant Dr. Moubarek.  (ECF No. 27 at 6.)  It appears that Dr. Moubarek had no direct interaction with the Decedent.
[8] There is no indication (either in Plaintiffs' Complaint or in the summary-judgment record) that either Nurse Eckard or Dr. Lin had any further interaction with the Decedent prior to his death.

Because the Decedent was not placed on any work restrictions at FCI Cumberland, he was assigned a standard job as a janitor/groundskeeper.  (ECF No. 1 ¶ 53.)  Plaintiffs allege that the Decedent's work crew was supervised by Defendant Officer Bennett (*id.* ¶ 54), though Officer Bennett attested that he was merely a substitute supervisor during the week of the Decedent's death.  (ECF No. 19–28 at 1.)[9]  According to Plaintiffs, in July 2013 the Mid-Atlantic region "experienced an extraordinary mid-summer heat wave, with temperatures in the 90s and very humid conditions."  (ECF No. 1 ¶ 59.)  In spite of the heat and humidity, the Decedent's work crew continued to labor for "long periods of time outside, even in the hottest part of the day."  (*Id.* ¶ 60.)  On July 16, 2013, in an apparent effort to escape the heat, the Decedent submitted a request for a reassignment to library duty; his request was approved the following day.  (ECF No. 19–20 at 1-2.)

On July 17, 2013, at approximately 6:00 p.m., Nurse Eckard was summoned to the Decedent's housing unit:  he informed her that "he had chest pressure and had just been working out prior to [the] onset of chest pain."  (ECF No. 32 at 1.)[10]  Nurse Eckard called for an ambulance, but at approximately 6:04 p.m., the Decedent became unresponsive.  (*Id.*)  Paramedics transported him to a local hospital, where he was pronounced dead.  (*Id.*)  An autopsy later revealed that the Decedent had suffered a "massive heart attack."  (ECF No. 1 ¶ 79.)

---

[9] Officer Bennett also averred that he "did not know the specific medical conditions of the inmates, including [the Decedent], whom [he] was supervising that week as the substitute supervisor."  (ECF No. 19–28 at 1.)

    Plaintiffs allege—on "information and belief"—that Officer Bennett "enforced strict requirements for the crew . . . and threatened disciplinary sanctions for any inmate who was perceived as not putting full effort into the assigned work."  (ECF No. 1 ¶ 55.)  Officer Bennett denied this allegation in his declaration, averring that he "did not subject the inmates [he] supervised to strict working requirements or threaten them with disciplinary sanctions" and that he "encouraged the inmates under [his] supervision . . . to work at their own pace, rest as needed, take frequent breaks inside the air conditioned buildings, and drink plenty of water."  (ECF No. 19–28 at 1.)

[10] The Individual Defendants attached various e-mail transcripts to their brief, ostensibly to show that the Decedent had undertaken a rigorous exercise program shortly before his death.  Perhaps defense counsel will argue that the Decedent's recreational activities contributed to his untimely demise.  However, the Court cannot possibly ascertain—from nothing more than a few casual e-mails—whether or to what extent such activities impacted the Decedent's health, and so it declines to consider the Decedent's exercise program at this juncture.

On December 22, 2014, Plaintiffs submitted an administrative tort claim to the BOP, which claim the BOP denied by correspondence dated March 26, 2015.  (*Id.* ¶ 5.)  On August 5, 2015, Plaintiffs filed a claim with the Maryland Health Care Alternative Dispute Resolution Office.  (*Id.* ¶ 7.)  Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-2A-06B, Plaintiffs also filed a waiver of arbitration (*see* ECF No. 1–1); they subsequently filed a Complaint in this Court, charging the Individual Defendants with deliberate indifference in violation of the Eighth Amendment (Count I) and seeking recovery from the United States under the FTCA (Count II) (ECF No. 1).  The United States answered Plaintiffs' Complaint (ECF No. 38), while the Individual Defendants moved to dismiss or, in the alternative, for summary judgment (ECF No. 19).  Plaintiffs opposed the Individual Defendants' motion (ECF No. 43), and the Individual Defendants replied (ECF No. 48).  The matter is ripe for decision.

## II.   *Deliberate Indifference*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments," such as those involving the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  In *Estelle v. Gamble*, the Supreme Court of the United States held that "deliberate indifference to serious medical needs of prisoners" constitutes the wanton infliction of pain, regardless whether the indifference is "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  429 U.S. 97, 104-05 (1976) (footnotes omitted).  In so holding, the Court cautioned that not every allegation of inadequate medical treatment states a claim under the Eighth Amendment.  *Id.* at 105.  Neither an "inadvertent failure to provide adequate medical care" nor "negligen[ce] in diagnosing or treating a medical condition" amounts to deliberate indifference.  *Id.* at 105-06.

Following *Estelle*, lower courts have crafted a framework for assessing Eighth Amendment deliberate-indifference claims.   To prevail on such a claim, the plaintiff must prove two elements:   "(1) that the deprivation of a basic human need, as an *objective* matter, was sufficiently serious; and (2) that, when viewed from a *subjective* perspective, prison officials acted with a sufficiently culpable state of mind."   *King v. United States*, 536 F. App'x 358, 360 (4th Cir. 2013) (emphasis added) (citing *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013)).   As the United States Court of Appeals for the Fourth Circuit has emphasized, courts must "consider prison officials' culpable mental state because 'only the unnecessary *and wanton* infliction of pain implicates the Eighth Amendment.'"   *Id.* at 360 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).   "To constitute deliberate indifference to a serious medical need, 'the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'"   *Id.* at 361 (alteration in original) (quoting *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994)).[11]   Moreover, a prison official is "deliberately indifferent to an inmate's serious medical needs only when he . . . subjectively 'knows of and disregards an excessive risk to inmate health or safety.'"   *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837).   In other words, the official must evince a *mens rea* equivalent to criminal recklessness—he must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Farmer*, 511 U.S. at 837.

---

[11] *Estelle* illustrated, by way of citation to prior case law, misconduct that may rise to the level of deliberate indifference.   For instance, a prison doctor who chooses the "'easier and less efficacious treatment' of throwing away the prisoner's ear and stitching the stump," or one who delivers a penicillin injection while knowing full well that the prisoner is allergic—and who then refuses to treat the resultant allergic reaction—may be liable for an Eighth Amendment violation.   429 U.S. 97, 104 n.10 (1976) (citation omitted).

Most deliberate-indifference cases address the "denial of medical care to a prisoner rather than the provision of substandard care; 'no care,' rather than 'bad care.'" *Jones v. United States*, Civ. No. 1:11cv115, 2012 WL 7681938, at *7 (N.D. W. Va. Dec. 18, 2012), *report adopted*, 2013 WL 955202 (N.D. W. Va. Mar. 12, 2013), *aff'd*, 531 F. App'x 306 (4th Cir. 2013) (mem.). To be sure, a claim arising from substandard care may be cognizable—but only in unusual circumstances, such as where the treatment provided is "so cursory as to amount to no treatment at all," *King*, 536 F. App'x at 362 (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

## III. Standard of Review

### A. Conversion to Summary Judgment

The Individual Defendants have moved to dismiss or, in the alternative, for summary judgment. Such a motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure," *Sager v. Hous. Comm'n of Anne Arundel Cty.*, 855 F. Supp. 2d 524, 542 (D. Md. 2012), which rule states that "[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Styling a motion in the alternative (as the Individual Defendants have done here) is "sufficient to provide notice to all parties that the motion may be converted to one for summary judgment," *Strothers v. City of Laurel*, 118 F. Supp. 3d 852, 860 (D. Md. 2015).

"Ordinarily, summary judgment is inappropriate 'where the parties have not had an opportunity for reasonable discovery.'" *Sager*, 855 F. Supp. 2d at 542 (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). Even so, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more

time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  The opponent typically must file an affidavit or declaration pursuant to Rule 56(d), proffering specific reasons why, without discovery, it cannot present facts essential to its opposition.  Rule 56(d) affidavits may not demand discovery for discovery's sake; a Rule 56(d) request is properly denied "where the additional evidence sought . . . would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995); *see also Ahmed v. Salvation Army*, Civ. No. CCB 12-707, 2012 WL 6761596, at *10 (D. Md. Dec. 28, 2012) ("A Rule 56(d) affidavit cannot conclusorily state that additional discovery is required.  It must specify 'why facts precluding summary judgment cannot be presented.  This includes identifying the probable facts not available and what steps have been taken to obtain these facts.'" (citation omitted)), *aff'd*, 549 F. App'x 196 (4th Cir. 2013) (per curiam); *cf. Washington v. Maynard*, Civ. No. GLR-13-3767, 2016 WL 865359, at *3 & n.3 (D. Md. Mar. 7, 2016) (converting motion under Rule 12(d) where plaintiff-prisoner failed to specify the information he sought to glean through proposed depositions); *Cason v. Wexford Health Servs., Inc.*, Civ. No. CCB-14-482, 2014 WL 6391048, at *6 (D. Md. Nov. 14, 2014) (converting motion under Rule 12(d) where plaintiff-prisoner had "not pointed to any additional evidence that would be helpful to the disposition of th[e] case").

In this case, Plaintiffs' counsel attached a Rule 56(d) declaration to Plaintiffs' opposition brief, outlining Plaintiffs' proposed discovery.  (*See* ECF No. 43–1.)  As a preliminary matter, the Court notes that much of the proposed discovery seems only tangentially related to the key questions before the Court—*i.e.*, whether Plaintiffs have pleaded a plausible case for deliberate indifference, and whether (with discovery) Plaintiffs could reasonably be expected to generate at

least a triable question of fact as to any such indifference.   Plaintiffs propose to probe the circumstances of July 17, 2013, including the hours the Decedent worked, the number of breaks he took, and the nature of his exercise that evening, as well as any investigatory steps officials undertook in response to the Decedent's death.   (*Id.* at 4-5.)   Some of this proposed discovery might yield evidence relevant to Plaintiffs' FTCA claim, but none of it seems especially germane to the Individual Defendants' Eighth Amendment liability.[12]

That said, Plaintiffs' counsel does identify several lines of inquiry that could theoretically lead to relevant evidence, such as (1) the Individual Defendants' knowledge of the Decedent's prior medical history; (2) the Individual Defendants' familiarity with cardiac care and risk prevention; and (3) the BOP's protocols governing cardiac health management.   Plainly, if a Defendant admitted on deposition that he or she *knew* the Decedent required stress testing or light duty and, throwing caution to the wind, acted in blatant disregard of that knowledge, Plaintiffs' deliberate-indifference theory might have some legs.

The problem with this proposed discovery is that it is rooted in nothing more than speculation.   There are no concrete factual allegations, and there is nothing in the current record, that would tend to suggest (1) that any Defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and (2) that such Defendant "dr[ew] the inference," *Farmer*, 511 U.S. at 837.   In the Complaint itself, once the Court pares back legal terms of art and unadorned conclusions about the Individual Defendants' knowledge, the Court is left with few facts from which to infer the source and substance of such purported knowledge.   Plaintiffs allege that Nurse Eckard and Dr. Lin reviewed the Decedent's medical history and that Dr. Moubarek cosigned Dr. Lin's report; Plaintiffs also opine that "reasonably

---

[12] The Court also observes that much of the proposed discovery seems directed more to the claim against Officer Bennett than to the claims against the medical practitioners.  However, as discussed in Part IV.C, *infra*, that claim is particularly weak and would be susceptible to dismissal even under the lenient Rule 12(b)(6) standard.

trained medical practitioners" know that persons with significant cardiac histories face elevated risks in extreme weather conditions and that the medications in the Decedent's regimen are "known" to cause persons who are taking them to experience exaggerated symptoms when exposed to extreme heat.  (ECF No. 1 ¶¶ 37, 45, 62.)[13]  But these allegations have nothing whatever to do with the actual knowledge of the Individual Defendants here; rather, they correspond to a negligence standard (*i.e.*, what medical practitioners reasonably should know).[14] For that matter, Plaintiffs' allegations concerning the Individual Defendants' knowledge are shakier than allegations in other cases in which the Fourth Circuit has concluded—*at the pleading stage*—that plaintiffs have failed to state a claim for deliberate indifference.  *See, e.g.*, *Jackson*, 775 F.3d at 178 (affirming dismissal of claim where physician misdiagnosed plaintiff with heart arrhythmia, even though plaintiff produced or offered to produce records showing that a cardiologist had previously diagnosed him with congestive heart failure); *King*, 536 F. App'x at 360 (affirming dismissal of claim where dentist mistakenly drilled healthy tooth, even though plaintiff tried to inform dentist and staff that he was only present for an examination).[15]

---

[13] It is unclear why Plaintiffs believe that any of the Defendant medical practitioners could have anticipated the unusual July 2013 heat wave to which Plaintiffs repeatedly refer in their Complaint.

[14] In fact, Plaintiffs separately allege that FCI Cumberland personnel "knew (or *should have known*)" that requiring the Decedent to spend prolonged periods outdoors would endanger his health.  (ECF No. 1 ¶ 62 (emphasis added).) Similarly, Plaintiffs' expert, Dr. Robert Cohen, noted in his preliminary report that (1) medical practitioners are "aware" of the risk of heat exposure and (2) the Individual Defendants here "were aware *or should have been aware*" of the Decedent's risk factors (ECF No. 43–2 at 4 (emphasis added).)  Dr. Cohen added that, while many prisons maintain policies to insure that at-risk inmates are kept cool during "heat-alert periods," he has "not been able to identify a particular BOP policy" designed to prevent heat-related injuries at FCI Cumberland.  (*Id.*)

These allegations and expert observations, if true, might have some bearing on Plaintiffs' FTCA claim.  But the Eighth Amendment deliberate-indifference standard requires a far more culpable mental state than mere negligence; the defendant must recklessly disregard an excessive risk of which he is subjectively aware.  None of Plaintiffs' averments correspond to this high degree of culpability.  *Cf. Danser v. Stansberry*, 772 F.3d 340, 347 (4th Cir. 2014) ("'[A]n official's failure to alleviate a significant risk that he should have perceived but did not' will not give rise to a claim under the Eighth Amendment." (citation omitted)).

[15] Given that the Individual Defendants' subjective awareness is an essential element of the *prima facie* case for deliberate indifference, and given the Supreme Court's admonition in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), that pleadings must contain sufficient factual content to raise a right to relief above the speculative level, the Court is not convinced that Plaintiffs' claims against the Individual Defendants would survive even a conventional Rule 12(b)(6) analysis.  Where the viability of a claim turns on the defendant's mental state, it is generally not enough to conclusively aver that the defendant had the requisite mental state; rather, a well-pled

Although in the ordinary case a district court should exercise caution in ruling on summary judgment in the face of a Rule 56(d) request, courts have repeatedly held that the rule does not authorize "fishing expedition[s]." *Agelli v. Sebelius*, Civ. No. DKC 13-497, 2014 WL 347630, at *9 (D. Md. Jan. 30, 2014) (alteration in original) (quoting *Morrow v. Farrell*, 187 F. Supp. 2d 548, 551 (D. Md. 2002), *aff'd*, 50 F. App'x 179 (4th Cir. 2002) (per curiam)); *accord Fierce v. Burwell*, 101 F. Supp. 3d 543, 554 (D. Md. 2015); *Alston v. United Collections Bureau, Inc.*, Civ. No. DKC 13-0913, 2014 WL 1660273, at *2 (D. Md. Apr. 23, 2014), *aff'd*, 585 F. App'x 196 (4th Cir. 2014) (mem.); *cf. Wright v. Eastman Kodak Co.*, 550 F. Supp. 2d 371, 382 (W.D.N.Y. 2008) ("While a Rule 56(f) [now Rule 56(d)[16]] discovery request may be granted to allow a plaintiff to 'fill material evidentiary gaps,' it may not be premised solely on speculation as to evidence which *might* be discovered[.]" (citation omitted)), *aff'd*, 328 F. App'x 738 (2d. Cir. 2009).   In *Agelli*, Judge Chasanow of this District denied a discovery request by a plaintiff bringing an age-discrimination claim.   In so doing, Judge Chasanow noted that, while the plaintiff had submitted a detailed Rule 56(d) affidavit, the crux of the plaintiff's argument was that she was entitled to discovery regarding aspects of the defendant-employer's selection

---

complaint must contain sufficient facts from which the Court can plausibly infer that the defendant possessed the applicable degree of awareness or knowledge.  *See Flemming v. Smith*, No. 9:11-CV-00804 (NAM/TWD), 2014 WL 3698004, at *6 (N.D.N.Y. July 24, 2014) ("Conclusory allegations that medical staff defendants were aware of a plaintiff's medical needs and failed to provide adequate care are generally insufficient to state an Eighth Amendment claim of inadequate medical care."); *Owens v. Jefferson*, C/A No. 0:09-2888-TLW-PJG, 2010 WL 3170148, at *5 (D.S.C. May 4, 2010) ("The United States Supreme Court has . . . made clear that when a plaintiff alleges a civil rights claim requiring him to establish a defendant's state of mind as an element of his claim, he must do so with specific factual allegations, not conclusory statements."), *report adopted*, 2010 WL 3170073 (D.S.C. Aug. 10, 2010), *aff'd*, 404 F. App'x 781 (4th Cir. 2010) (per curiam); *cf. Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) ("To be sure, the original complaint throws in words and phrases such as 'deliberate indifference,' 'malicious,' 'outrageous,' and 'wanton' when describing the conduct of the [defendants].  The presence, however, of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of deliberate indifference.").

The Court need not ultimately decide whether Plaintiffs' Eighth Amendment claims could survive Rule 12(b)(6) review, because—after converting the Individual Defendants' motion via Rule 12(d)—the Court need not accept any unsubstantiated allegations as true.  But the fact that Plaintiffs' claims would have been suspect even in the forgiving light of Rule 12(b)(6) reinforces the Court's conclusion that conversion, on the particular facts of this case, is appropriate.

[16] "Rule 56(f) was recodified as Rule 56(d) on December 1, 2010, without significant substantive change." *Works v. Colvin*, 519 F. App'x 176, 181 n.7 (4th Cir. 2013).

decisions and hiring practices—*i.e.*, she "hope[d] to locate some evidence probative of pretext and believe[d] that she 'should be allowed to find out if [she] ha[d] a claim, rather than that [she] ha[d] a claim for which [she] need[e]d . . . discovery.'" 2014 WL 347630, at *10 (alterations added and in original) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994)).  In this case, it strikes the Court that Plaintiffs have neither proof nor a particularly good reason to believe that the Individual Defendants consciously disregarded an excessive risk to the Decedent's health; rather, Plaintiffs hope that depositions or similar fact discovery might yield evidence of such *mens rea*.  The Court is disinclined to license a fishing exhibition—particularly where, as here, the Individual Defendants have adduced evidence that seems flatly at odds with the notion that they were deliberately indifferent to the Decedent's wellbeing.  *Cf. Mullins v. United States*, Civ. No. 1:06cv105, 2007 WL 2471117, at *6 (N.D. W. Va. Aug. 30, 2007) (declining plaintiff's discovery request where medical records spoke for themselves and "conclusively establish[ed] that [plaintiff's] health care providers . . . ha[d] not been deliberately indifferent to any of his medical needs"), *aff'd*, 262 F. App'x 523 (4th Cir. 2008) (per curiam).

An additional factor counsels in favor of Rule 12(d) conversion at this juncture. Although the Individual Defendants primarily argue, on the merits, that Plaintiffs cannot show Defendants acted with deliberate indifference, they also contend that they are entitled to qualified immunity.  The doctrine of qualified immunity "protects government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Danser v. Stansberry*, 772 F.3d 340, 345 (4th Cir. 2014).[17]  The Supreme Court has repeatedly "stressed the importance of

---

[17] The Individual Defendants do not question whether the Decedent's right to adequate medical care was clearly established at the time of his death—it plainly was, *see Grimes v. Merritt*, Civ. No. JKB-11-2687, 2015 WL 5158722, at *7 n.20 (D. Md. Aug. 31, 2015)—and so, for all practical purposes, the qualified-immunity analysis is identical to the analysis on the merits.  Because Plaintiffs cannot demonstrate that the Individual Defendants were

resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  This is so because qualified immunity is an "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) ("The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.'" (citation omitted)).    Thus, when a plaintiff files a Rule 56(d) request in opposition to a dispositive motion by a defendant who has asserted qualified immunity, the plaintiff's burden is "somewhat elevated . . . because officials have 'a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery.'" *Gomez v. Martin*, 593 F. App'x 756, 760 (10th Cir. 2014) (citation omitted); *see also Foster v. City of Asheville*, No. 1:09-cv-442-RJC, 2011 WL 1234097, at *3 (W.D.N.C. Mar. 30, 2011) ("The burden on the party seeking to invoke Rule 56(d) is especially heavy in cases . . . which involve[] qualified immunity. Although affidavits submitted under Rule 56(d) are generally entitled to liberal treatment, this standard does not apply in the qualified immunity context because 'discovery should not be allowed' until the 'threshold immunity question is resolved.'" (citation omitted)); *cf. Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998) ("In qualified immunity cases, the Rule 56(f) balancing is done with a thumb on the side of the scale weighing against discovery.").

Because Plaintiffs' Rule 56(d) request—insofar as it relates to their Eighth Amendment claims—is grounded in speculation; because discovery relating to the Individual Defendants' subjective intent would amount to a fishing expedition; and because the Court is obligated to address assertions of qualified immunity at the earliest feasible stage, the Court will exercise its

---

deliberately indifferent to the Decedent's medical needs, *see infra* Part IV, and because Plaintiffs have alleged no other constitutional violation, the Individual Defendants are entitled to immunity.

discretion under Rule 12(d) and review the Individual Defendants' motion pursuant to the summary-judgment standard of Rule 56.

### B.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. Moreover, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Fourth Circuit has emphasized the "affirmative obligation of the trial judge to prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp.*, 477 U.S. at 323-24).

The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of its pleading but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

### IV.    Analysis

In their motion, the Individual Defendants principally argue that they are entitled to summary judgment because "Plaintiffs cannot show that the Individual [] Defendants acted with deliberate indifference in the care and treatment of [the Decedent] as required to establish an Eighth Amendment violation."  (ECF No. 19–1 at 10.)

For the reasons discussed in this Part, the Court agrees.

### A.    Nurse Eckard and Dr. Lin

Plaintiffs contend that Nurse Eckard and Dr. Lin exhibited deliberate indifference for the Decedent's medical needs by failing to schedule the Decedent for a cardiac consultation or for certain diagnostic testing (such as a stress test) and by "fail[ing] to indicate that [the Decedent] required . . . special accommodations, including light duty work assignments or limited exposure to extreme weather conditions."  (ECF No. 1 ¶¶ 40-41, 45, 47.)

As for Plaintiffs' allegations regarding cardiac consultation and stress testing, such allegations (without more) do not state a claim for deliberate indifference.  On the contrary, courts have repeatedly rejected Eighth Amendment claims stemming from allegations that medical practitioners failed to provide diagnostic tests—even in cases where such tests might have proved highly beneficial to the prisoner-plaintiffs or where failure to provide such tests may have constituted medical malpractice.  *See, e.g.*, *Estelle*, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."); *Barnes v. Wilson*, 110 F. Supp. 3d 624, 632 (D. Md. 2015) ("There is no Eighth Amendment violation where diagnostic tests are declined based on medical assessments of the patient."); *Smith v. Mathis*, Civ. No. PJM

08-3302, 2012 WL 253438, at *5 (D. Md. Jan. 26, 2012) ("[Plaintiff] complains that Defendants should have conducted diagnostic tests and sent him to a specialist or to a surgical consultation given the symptoms he described.   His argument, however, goes to Defendants' medical judgment, not their deliberate indifference."), *aff'd*, 475 F. App'x 860 (4th Cir. 2012) (per curiam); *cf. Zackery v. Mesrobian*, 299 F. App'x 598, 601 (7th Cir. 2008) (affirming summary judgment to physician in spite of physician's misdiagnosis and his rejection of specialist's recommendation for diagnostic testing that might have identified injury years earlier).[18]

More broadly, "[d]isagreement with a doctor's particular method of treatment, without more, does not rise to the level of an Eighth Amendment violation." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010)); *see also Jackson*, 775 F.3d at 178 ("Though hindsight suggests that [physician's] treatment decisions may have been mistaken, *even gravely so*, we agree with the district court that [plaintiff's] claim against [physician] is essentially a '[d]isagreement[] between an inmate and a physician over the inmate's proper medical care,' and we consistently have found such disagreements to fall short of showing deliberate indifference." (alterations added and in original) (emphasis added)); *Alvarez v. Stewart*, Civ. No. RWT-14-1044, 2015 WL 1402429, at *8 (D. Md. Mar. 25, 2015) ("[Plaintiff's] claims for physical therapy and pain medication represent a difference of opinion with his medical providers about the course of his treatment,

---

[18] Plaintiffs rely on *D'Agostino v. Montgomery County*, Civ. No. 11-7728, 2012 WL 425071 (E.D. Pa. Feb. 9, 2012), a case litigated by Plaintiffs' counsel, for the proposition that failure to conduct proper diagnostic testing *can* amount to deliberate indifference.   But in *D'Agostino*, the defendant doctor was aware both that the plaintiff was presently suffering from a serious and worsening infection that had been previously misdiagnosed *and* that the plaintiff was not responding to his course of antibiotics—yet she failed to change his medications or order additional tests.   *Id.* at *3.   Given such egregious facts, the court found that the plaintiff stated a claim for deliberate indifference.   In this case, by contrast, there is no allegation or evidence that the Decedent was experiencing *any* cardiac symptoms when he met with Nurse Eckard and Dr. Lin.

and as such, do[] not establish requisite deliberate indifference necessary to support an Eighth Amendment claim."); *accord Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).[19]

As for Plaintiffs' allegations regarding light duty or limited exposure to the elements, there is no indication that Nurse Eckard or Dr. Lin were aware of the need for any such accommodations.  In fact, the request for transfer from FPC Devens to FCI Cumberland stated that the Decedent had been assigned a "regular duty work status with no medical restrictions." (ECF No. 19–11 at 1.)[20]  While Plaintiffs allege that the Decedent grew concerned about the "deleterious effect" of the summer 2013 heat wave and that he believed he had "no control over his job assignment" (ECF No. 1 ¶¶ 63-64), they do not allege that he brought these concerns to the attention of Nurse Eckard or Dr. Lin, nor do they allege that those medical practitioners had any obligation to actively monitor or follow up on the Decedent's medical status:  on the contrary, when Dr. Lin discharged the Decedent, he advised him to contact sick call or the chronic-care clinic as needed, to return immediately if his condition worsened, and to attend a scheduled chronic-care appointment in October 2013.  (ECF No. 27 at 5.)

Courts have dismissed deliberate-indifference claims arising from failure to accommodate even in some cases in which the defendants were indisputably on notice of the plaintiff's request for an accommodation.  *See, e.g.*, *Hailes v. Free*, Civ. No. 2:12-cv-00687, 2012 WL 5988726, at *3 (S.D. Ohio Nov. 29, 2012) (plaintiff did not allege facts sufficient to

---

[19] *Cf. United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) ("Although an inmate certainly has a right to necessary medical treatment, he does not have a right to demand that the opinion of his pre-imprisonment doctor be permitted to override the reasonable professional judgment of the prison's medical team.").

[20] *Cf. Estate of Henson v. Krajca*, 440 F. App'x 341, 344 (5th Cir. 2011) (holding that jail nurse should have been granted qualified immunity where she continued the course of treatment prescribed by an emergency-room doctor and initiated by a different nurse).

In their opposition brief, Plaintiffs contend that the Decedent's work detail at FPC Devens, though technically not light duty, nevertheless involved low-impact work (specifically, training service dogs).  (ECF No. 43 at 23 n.9.)  Assuming that is so, the Court is unsure what bearing it has on Nurse Eckard's and Dr. Lin's culpability here:  the transfer order simply indicates that the Decedent was on regular duty, and there is no indication (nor any allegation in the Complaint) that these medical practitioners were aware of the particular tasks for which the Decedent had been responsible at his prior place of incarceration.

meet the subjective component of deliberate indifference where he complained, *inter alia*, that doctor refused to prescribe light duty and a bottom bunk); *Stamper v. Blackwell*, No. 1:10-cv-00155-SKO PC, 2011 WL 1344588, at *3 (E.D. Cal. Apr. 8, 2011) (plaintiff did not plead a plausible claim for deliberate indifference where he alleged, *inter alia*, that his requests for an egg-crate mattress, a bottom-bunk accommodation, and a light-duty work detail were denied).  It follows that where, as here, there is no indication that either Nurse Eckard or Dr. Lin were on notice of any need for special accommodations (and where their fleeting interactions with the Decedent took place months before the alleged "heat wave"), their failure to anticipate and adjust for a nonobvious need does not constitute cruel and unusual punishment.

Finally, even assuming *arguendo* that Nurse Eckard and/or Dr. Lin should have known that the Decedent required stress testing or a light-duty accommodation, and *even if* their failure to prescribe such measures amounted to medical malpractice, such failure still would not establish that these Defendants were deliberately indifferent to the Decedent's medical needs—*i.e.*, that they subjectively knew of and disregarded an excessive risk to his safety, *Jackson*, 775 F.3d at 178.  As discussed in Part III.A, *supra*, once Plaintiffs' conclusory assertions about the Individual Defendants' knowledge are excised from the Complaint, the only factual or quasi-factual allegations supporting such knowledge are (1) the fact that Nurse Eckard and Dr. Lin reviewed the Decedent's medical history and (2) the notion, espoused by Plaintiffs (and their expert), that reasonably trained medical practitioners are familiar with the risk of heat and the importance of certain assessments for patients with heart problems.  (*See* ECF No. 1 ¶¶ 40, 45, 62 & 43–2 at 4-5.)  The Court must balance these spare allegations, which correspond more to a negligence standard than to deliberate indifference, against the substantial documentation that defense counsel has supplied.  And in light of that documentation, it is simply implausible to contend that Nurse Eckard

and Dr. Lin—who, during their fleeting interactions with the Decedent, conducted physical examinations, noted items for follow-up, renewed medications, and ordered additional cardiac testing—were nevertheless callously, wantonly indifferent to the Decedent's cardiovascular health. This is particularly so because there is no evidence (nor any allegation) that the Decedent complained about any cardiac symptoms during these medical appointments. On the contrary, in view of the summary-judgment record, it appears that the Decedent complained of no such symptoms at *any* point during his incarceration—that is, until moments before he died. An untimely death is a great misfortune, and the Court hopes that, had the medical personnel at FCI Cumberland recognized the fragility of the Decedent's health, they would have taken additional steps to monitor and treat him. But their failure to anticipate an emergency—*even if negligent*[21]— does not amount to deliberate indifference. *Cf. Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences.").[22]

---

[21] To be clear, the Court makes no assessment as to the alleged negligence of FCI Cumberland's medical personnel. The Court leaves that matter for another day, as Plaintiffs' FTCA claim moves forward.

[22] In their opposition brief, Plaintiffs cite *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834 (6th Cir. 2002), for the proposition that a medical practitioner who has provided a patient with *some* care may not necessarily have provided constitutionally *adequate* care. (*See* ECF No. 43 at 11-12.) Plaintiffs' proposition is undoubtedly correct, but *Terrance* is readily distinguishable on its facts. In *Terrance*, each of the medical practitioners against whom the court allowed the plaintiff's claim to proceed demonstrated a much higher degree of culpability than the Individual Defendants demonstrated here. Dr. Ardeshir Said knew that the patient was an obese diabetic with currently abnormal EKG readings—yet he failed to order the patient to remain within cool areas (in violation of hospital protocol) and failed to respond promptly (or explain his delay) after being paged about the patient's medical emergency. *Id.* at 844-45. Dr. O.R. Lee was also familiar with the patient's health problems; what is more, after she discovered him suffering from apparent hyperthermia, she waited nearly an hour before providing necessary medical treatment. *Id.* at 845. Dr. Govindan Sadasivan knew of the patient's proclivity to wander—yet he discontinued an escape alert just four days after it was implemented on the grounds that the patient told him he "did not feel like escaping." *Id.* And Nurse Sherley Owens personally referred the patient to off-ward activities on an unusually hot day—without supervision and in direct contravention of hospital policy. *Id.* at 846. Nothing in the Complaint or the summary-judgment record here suggests that either Nurse Eckard or Dr. Lin (or any other Defendant) acted with the kind of callous recklessness evinced by the *Terrance* practitioners.

Other cases on which Plaintiffs rely (most of which were decided by courts sitting outside this Circuit) are similarly distinguishable. *See, e.g.*, *Ball v. LeBlanc*, 792 F.3d 584, 594-95 (5th Cir. 2015) (trial judge properly ruled for inmates who suffered from cardiovascular ailments and who complained about excessive heat in housing units where evidence showed that prison maintained a list of vulnerable inmates yet failed to include plaintiffs on list and where, after lawsuit was filed and during court-ordered monitoring period, defendants "surreptitiously installed

In light of the foregoing, no reasonable jury could conclude that Nurse Eckard or Dr. Lin were unconstitutionally indifferent to the Decedent's medical needs.   Accordingly, these Defendants are entitled to judgment as a matter of law.

### B.   Dr. Moubarek

Plaintiffs' claim against Dr. Moubarek is materially identical to their claims against Nurse Eckard and Dr. Lin—*i.e.*, he failed to appreciate the Decedent's need for stress testing and light duty.   However, the claim as against Dr. Moubarek is even more attenuated and implausible than were the claims against Nurse Eckard and Dr. Lin.   This is so because Dr. Moubarek neither treated the Decedent nor, so far as the Court can tell, had any interaction with him whatsoever. Rather, Dr. Moubarek merely cosigned Dr. Lin's report.

Plaintiffs' theory as to Dr. Moubarek's liability is somewhat unclear.   To the extent that Plaintiffs seek to hold Dr. Moubarek accountable in his capacity as clinical director at FCI Cumberland, the Court observes that *respondeat superior* is unavailable in *Bivens* cases, *see Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).   And while supervisors can be held directly liable for the gross misconduct of their subordinates, the bar for imposing such liability is quite high—requiring, among other showings, an "affirmative causal link" between the supervisor's inaction and the plaintiff's constitutional injury.[23]   Even had Dr. Lin's treatment of the Decedent somehow amounted to an Eighth Amendment violation, the Court

---

awnings and began soaking . . . exterior walls with water," leading court to infer that defendants subjectively knew of a substantial risk to plaintiffs' health); *Blackmon v. Garza*, 484 F. App'x 866, 871-73 (5th Cir. 2012) (jury question as to deliberate indifference where inmates were kept in mostly sealed dorms without air conditioning or fans during Texas summer heat and where plaintiff testified that he had repeatedly complained to prison infirmary but that infirmary staff refused to document his high blood pressure or health complaints).

[23] *See Lagana v. Baucom*, Civ. No. PJM-10-1032, 2011 WL 2148798, at *4 (D. Md. May 31, 2011) ("Supervisory liability . . . must be supported with evidence that:  (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.").

doubts that Dr. Moubarek's cosignature on a standard medical form establishes a legally sufficient causal link to the resultant injury.

Perhaps, though, Plaintiffs do not intend to hold Dr. Moubarek liable in his supervisory capacity; perhaps they theorize that, by cosigning Dr. Lin's report, Dr. Moubarek assumed full legal responsibility for its contents (and for related treatment decisions and follow-up) just as though he had examined the Decedent and drafted the report himself.  But if *that* is Plaintiffs' theory, they cite no authority to support it (and the Court is aware of none):  on the contrary, courts have rejected claims of deliberate indifference on strikingly similar facts.  *See, e.g.*, *Peterson v. United States*, No. CV 15-00143 AB (RAO), 2015 WL 9311638, at *5 (C.D. Cal. Oct. 19, 2015) (dismissing *Bivens* claim against doctor who did not personally treat plaintiff but who instead reviewed other practitioners' treatment records and allegedly "rubber stamped" them), *report adopted*, 2015 WL 9412101 (C.D. Cal. Dec. 21, 2015); *Moore v. U.S. Agric. Dep't*, Civ. No. 14-114-DLB, 2015 WL 4875316, at *6 (E.D. Ky. Aug. 13, 2015) (dismissing *Bivens* claim against doctor whose conduct, in simply cosigning records, was insufficient to establish that he was directly involved in the plaintiff's treatment).

No rational jury could find Dr. Moubarek liable for an Eighth Amendment violation on these scant facts; accordingly, he is entitled to judgment as a matter of law.

### C.   *Officer Bennett*

Finally, Plaintiffs accuse Officer Bennett of violating the Decedent's Eighth Amendment rights by requiring him to "put forth full effort in [his] outdoor work even in extreme weather conditions."  (ECF No. 1 ¶ 61.)  Plaintiffs characterize Officer Bennett as a taskmaster who "threatened disciplinary sanctions for any inmate who was not perceived as putting full effort

into the assigned work." (*Id.* ¶ 55.)[24]

In response, Officer Bennett supplied a declaration in which he attested that (1) he was not the Decedent's normal work supervisor but was merely a substitute during the week that the Decedent died; (2) he was not familiar with the Decedent's medical conditions; and (3) he did not subject his charges to strict working requirements or threaten them with sanctions but instead encouraged them to work at their own pace, take frequent breaks, and stay hydrated.  (ECF No. 19–28 at 1.)  Such attestations, if true, are wholly incompatible with a finding of deliberate indifference.

Even assuming, however, that Officer Bennett *was* somehow familiar with the Decedent's medical history, such familiarity would not expose him to Eighth Amendment liability because he was entitled to rely on the professional judgment of the medical personnel who were responsible for the Decedent's care.  *See Krug v. Loranth*, No. 1:13-cv-01409-DCN, 2014 WL 4955365, at *7 (D.S.C. Sept. 29, 2014) ("[N]on-medical prison personnel are entitled to rely on the expertise of health care providers." (citing *Iko*, 535 F.3d at 242)), *aff'd*, 599 F. App'x 512 (4th Cir. 2015) (mem.), *cert. denied*, No. 15-8205, 2016 WL 1278945 (U.S. Apr. 4, 2016) (mem.); *accord Muhammad v. Smith*, No. 7:16CV00034, 2016 WL 1464640, at *4 (W.D. Va. Apr. 12, 2016); *Ingram v. Warden*, Civ. No. WDQ-14-561, 2015 WL 4129222, at *8 (D. Md. July 6, 2015); *Dicks v. Flury*, Civ. No. GLR-14-1016, 2015 WL 847409, at *5 (D. Md. Feb. 25, 2015); *Sloan v. Lee*, Civ. No. JKB 13-3843, 2015 WL 273219, at *17 (D. Md. Jan. 20, 2015). In fact, Plaintiffs aver in their Complaint that the Decedent's assignment as a janitor/groundskeeper "resulted *directly* from the failure of BOP medical staff . . . to order any accommodation for [his] medical condition."  (ECF No. 1 ¶ 57 (emphasis added).)  Plaintiffs

---

[24] Plaintiffs' characterization stands in stark contrast with the Decedent's own description of his supervisors:  in an e-mail, he acknowledged that they were "pretty good about giving [him] water and rest breaks."  (ECF No. 37 at 1.)

further aver that, on the day of his death, the Decedent worked outdoors "[a]s required by the defendant officers *in the absence of any contrary orders* from the defendant health care providers." (*Id.* ¶ 67 (emphasis added).)   Crucially, Plaintiffs do not allege (and there is certainly no evidence to suggest) that Officer Bennett had any control whatsoever over the Decedent's work assignment.   Deliberate indifference requires much more than debatably uncharitable conduct; it requires treatment so incompetent, so inadequate, or so excessive as to shock the conscience, *King*, 536 F. App'x at 361.   Even discounting Officer Bennett's declaration, the Court's conscience is not shocked by the notion that the officer—in compliance with doctors' orders on which he was lawfully entitled to rely—required his charges to work industriously on a hot day.[25]   *Cf. Knight v. Wiseman*, 590 F.3d 458, 465 (7th Cir. 2009) (affirming district court's grant of summary judgment to supervisory officers where prisoner with shoulder injury "did not have any medical work restrictions on his record" and where, consequently, officers were "entitled to rely on [that] fact and conclude that [he] could work without endangering his health"); *Mays v. Rhodes*, 255 F.3d 644, 649 (8th Cir. 2001) (reversing district court's denial of qualified immunity to supervisor and other officers where prisoner had been medically cleared with no restrictions and where record was devoid of evidence showing that prisoner displayed signs of distress prior to his collapse from heat exhaustion).

No reasonable jury could conclude that Officer Bennett violated the Decedent's Eighth Amendment rights, and so the officer is entitled to judgment as a matter of law.

---

[25] In a footnote, Plaintiffs propose that even if Officer Bennett was unaware of the Decedent's cardiac condition, "requiring *any* inmate to work outdoors in the weather conditions during the week of July 15, 2013, was reckless and dangerous." (ECF No. 43 at 26 n.11.)  Setting aside the lack of evidence (or any allegation) that Officer Bennett had any control over inmates' work assignments, the Court declines to signal that prison officials, merely by requiring inmates to labor outdoors on a hot summer day, could be exposed to constitutional tort liability.

## V.   Conclusion

In closing, the Court commends counsel for both parties on their thorough briefing in this matter.  Counsel approached the facts and the relevant authorities with care and deliberation, and they articulated their strongest arguments admirably.  In the end, however, the Court's analysis is constrained by standards well-settled in the case law—and the standard for establishing and proving an Eighth Amendment deliberate-indifference claim is onerous indeed.  "[R]elief under the Eighth Amendment is reserved for cases of cruel and unusual punishment, that is, egregious conduct by prison officials reflecting the 'unnecessary and wanton infliction of pain.'"  *King*, 536 F. App'x at 364 (quoting *Wilson*, 501 U.S. at 297).

The bar was set high decades ago in *Estelle*, and it remains high today—and Plaintiffs, despite their best efforts, cannot surmount it.[26]  Accordingly, an Order shall enter GRANTING the Individual Defendants' Motion for Summary Judgment (ECF No. 19).

DATED this 4th day of May, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge

---

[26] This is not to suggest, of course, that Plaintiffs are necessarily left without a remedy.  As noted above, the United States has answered Plaintiffs' FTCA claim—and while the Court does not offer any assessment as to the merits of that claim, the case will proceed to discovery on Plaintiffs' negligence theory (a theory that is frankly better suited to the facts as alleged by Plaintiffs and as adduced by the Individual Defendants for purposes of the pending motion).